GRENVILLE HOVEY *et ali.*, in equity,

*vs.*

ALFRED STORER AND JOHN BABSON.

*An agreement void from public policy, the court will not aid.*

In February, 1862, the owners of the the ship James Hovey authorized their agent to charter their vessel to the United States for a hundred dollars a day, relinquishing to him all obtained above that sum. Through the intervention of John Babson, a government charter at $150 per day was secured, and the vessel employed one hundred and forty-two days at that rate. The whole amount paid by the United States came into the hands of Alfred Storer (one of the owners) by order of the ship's agent upon Babson; and Storer paid Babson $5000 of the $7,100 difference between what the United States paid and what the owners agreed to take, and retained $2,100 of it in his own hands to the time of the filing of this bill for an account of the ship's earnings: *Held,* that, although the arrangement was void, as contrary to public policy, and could not have been enforced at law by Babson for this reason; yet, so far as it had been executed, the court would not disturb it, to aid parties *in pari delicto,* but would permit him to retain the $5000 he had received; but that the balance of $2,100 in Storer's hands must be divided among the owners of the James Hovey.

BILL IN EQUITY. The facts upon which it is based, and the end sought to be accomplished by it, are fully stated in the opinion.

*John S. Abbott* and *J. Ruggles,* for the complainants.

*A. P. Gould,* for Alfred Storer.

*Bradbury & Bradbury,* of Portland, for John Babson.

VIRGIN, J. Bill to recover the difference between one hundred dollars per day which the plaintiffs actually received, and one hundred and fifty dollars per day which the United States government actually paid, for the charter of the ship "James Hovey" one hundred and forty-two days employed in transporting troops to the "Department of the Gulf."

The original bill, brought by Grenville Hovey, Myron M. Hovey, Farley O. Hovey, heirs at law of James Hovey, deceased,

Eliza A. Hovey his widow, each owning one-eighth, and George W. Robinson, master, and owning one-quarter of the ship, was against Alfred Storer, ship's husband, and owner of the remaining quarter. Subsequently, when most of the testimony had been taken, the bill was amended and John Babson made a party defendant.

The substantial claim is that Storer, by certain alleged false and fraudulent representations, induced the plaintiffs to consent to the chartering of the ship to the government at the rate of one hundred dollars per day; that through one Kennedy—an administrator on the estate of James Hovey—aided by Babson, Storer chartered her in fact at the rate of one hundred and fifty dollars per day; that he received from the government at the latter rate, $21,300; that of the surplus $7,100, he delivered $5000 to Babson, returning $2,100 for his own benefit; and that, by concealing the facts, and by falsely pretending that the whole surplus of $7,100 was claimed by and allowed to the officers and agents of the government, he fraudulently persuaded the plaintiffs into a settlement with him on the basis of one hundred dollars per day.

From the large mass of evidence in the case we find these material facts:

In the early part of 1862, the Gulf expedition, with its temporary headquarters at Boston, having been fully inaugurated, regiments organized and equipped and munitions of war prepared, the quarter-master's department wanted vessels for transportation. A large number of vessels were offered. On February 7, John H. Kennedy, having chartered one of his own vessels for the expedition, telegraphed from Boston to Storer, at Waldoboro, for the lowest sum for which the James Hovey could be chartered—she then lying unemployed in New York harbor, with her register there recorded showing one-half of her belonging to the estate of James Hovey, on which Kennedy was one of the administrators. On the next day, Storer answered (as the result of his consultation with Robinson) "one hundred dollars per day;" and he and Robinson went immediately to Boston, where Grenville Hovey (who

represented his mother and brothers) resided. There all the parties had frequent consultations during the succeeding two or three days; and Robinson, Storer and Grenville Hovey agreed that their vessel should be chartered at the rate of $100 per day. Accordingly, on February 12, 1862, Robinson, in a power of attorney describing himself as "master and one-quarter owner" authorized Storer "to charter said ship;" whereupon Storer made and signed the following indorsement thereon. "I, Alfred Storer, owner of one-quarter of ship James Hovey, make over the above power of attorney to John H. Kennedy, and authorize him to charter the aforesaid one-quarter and my one-quarter, he being the representative of the other half, to the United States government, at such price as he may see fit, in his own name ; and we will exact from him at the rate of $100 per day, and all above that sum we relinquish to him—that is, we charter the ship to him at $100 per day, to be employed by government."

On February 17, Kennedy chartered her at the rate of $150 per day; and she continued in the employment of the government under the charter-party until July 9, 1862, when it was terminated.

Robinson went master and received a copy of the charter-party (the consideration left blank) at Ship Island in April following, and wrote to Grenville Hovey "to ascertain how much the government was paying for the Hovey." Hovey wrote to the War Department, at Washington, and on May 29, received an official answer that the government were paying $4,500 per month—$150 per day. This information Hovey communicated to his mother and brothers whom he represented, and to Captain Robinson, on his return with his ship to Boston, on July 7. On July 8, Capt. Robinson, as master, drew $2000 from the quarter-master in Boston, with which to pay off his crew and indorsed that sum on the charter party.

Between the 7th and 11th of July, Robinson, Storer and Grenville Hovey had frequent consultations in relation to the amount they should claim, and finally agreed that Storer should claim only at the rate of $100 per day. Accordingly Storer called upon

Kennedy, who being sick at home, delivered to Storer an order on Babson for the proper vouchers to draw the money, on condition that Storer would pay the surplus to Babson. Thereupon Storer obtained the vouchers, drew the whole amount less the $2000 advanced to Robinson, paid to Babson $5000 of the surplus, and by the directions and for the benefit of Kennedy, retained the remainder of the surplus ($2,100) for the alleged purpose of paying certain outstanding bills; and on August 27, Storer settled with the master and the other owners upon the basis of $100 per day. All the plaintiffs concur in testifying that this settlement was deliberately and understandingly made and that they never notified Storer that they were dissatisfied with it until this bill was served upon him.

The plaintiffs charge Storer with practising a gross fraud upon them and contend that he in fact chartered his and their ship to the government using the hand of Kennedy as a cover for his alleged fraudulent representations as to the rate, by which he procured their consent to it, and that he in fact was to share with Babson the surplus.

We do not think the evidence sustains these allegations. Shipping was dull. Their vessel was unemployed. It is quite certain that she could not have been employed in that service except through the intervention and recommendation of Babson. Her value, as stated in the charter party, was $35,000. Storer was directly interested in her. He might well be satisfied with a rate that would pay for her in a year, regardless of the sum which the broker might realize. It was the most favorable service, pecuniarily, she was ever employed in, considering the term of employment. This, together with the stout denial of Storer in answer and depositions, weighs heavily against the plaintiffs' charges.

The contract made through Babson was clearly against public policy; and if it had remained executory, he would have sought in vain the aid of courts in any attempt to recover the price agreed upon for his services and good will, notwithstanding they may have resulted beneficially to the plaintiffs. *Tool Co.* v. *Norris,*

2 Wallace, 45, and cases cited. But it has been fully executed, save the payment of the $2,100 now remaining in Storer's hands.

But if it be conceded that Storer misrepresented the rate and thereby fraudulently induced the plaintiffs to assent to a chartering at the false rate, they all agree that they learned from the highest official source what the real rate was. This information was known to all except Robinson as early as the latter part of May. Robinson's suspicions induced him to write for information while at Ship Island and he received it from Grenville Hovey immediately upon his arrival in Boston. If he then had any doubts they must have all been removed on July 8, when he saw the charter party itself and indorsed thereon the money advanced for the paying off of his crew. Such full and timely knowledge —obtained before any attempt at collecting the ship's dues— succeeded by frequent consultations of all the owners, resulting in their unanimous unqualified agreement to claim only the lower rate, followed by a settlement deliberately and understandingly made upon that basis, after six weeks more time for consideration and investigation, would deprive them of all claim for the interference of a court· of equity, especially when the parties have suffered no damage. *Pratt* v. *Philbrook*, 33 Maine, 17.

But, as already seen, Storer is not proved to be guilty of fraud upon his co-owners. He, in accordance with their agreement and advice, collected what they considered to be due them and him; but in doing so, and in order that he might promptly obtain it, the whole charter-money came into his hands, and he has paid over to Babson only a portion of the surplus, which, according to the terms of the illegal contract, would belong to, and which is claimed by, Babson. So far as this unpaid balance is concerned, the contract remains executory. Babson could not recover it. It not having actually been paid and applied in execution of the contract, the owners may retain it. *Bone* v. *Eckless*, 29 L. J. Exch., 438.

Out of this $2100, we think Storer should have his commissions and the master his primage; and the balance should be appor-

Newbit *v.* Appleton.

tioned *pro rata* among the several owners, deducting from Robinson's share $283.82 advanced to him by Storer and giving Storer the benefit of that sum—the clerk to ascertain the particular sums belonging to the several owners according to the foregoing principles.

Under the circumstances of this case no costs are to be allowed to either of the parties.                    *Decree accordingly.*

APPLETON, C. J., CUTTING, WALTON, BARROWS and DANFORTH, JJ., concurred.